UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JERRY B. DARVELL,                              Case No. 07-CV-2113 (PJS/RLE)

                Plaintiff,

                               ORDER GRANTING DEFENDANT'S
v.                                             MOTION FOR SUMMARY JUDGMENT

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

                Defendant.

James W. Balmer and Stephanie M. Balmer, FALSANI, BALMER, PETERSON, QUINN & BEYER, for plaintiff.

Scott R. Carlson, HINSHAW & CULBERTSON LLP, for defendant.

Plaintiff Jerry Darvell participated in a long-term disability plan ("the Plan") that was sponsored by his former employer, Yellow Book USA, Inc. ("Yellow Book") and established pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Defendant Life Insurance Company of North America ("LINA") insured the Plan and also served as the claims administrator. Darvell brought this action to seek review of LINA's decision to deny his claim for long-term disability benefits.

This matter is before the Court on LINA's motion for summary judgment. For the reasons set forth below, the motion is granted, and Darvell's complaint is dismissed with prejudice.

I. BACKGROUND

A. Darvell's Health and Work History

From May 2003 to March 2005, Darvell worked as an account representative for Yellow Book, selling advertising space in phone books. Administrative Record ("AR") 84, 598. Darvell

stopped working in March 2005, when LINA approved his application for short-term disability benefits.  AR 653-54.  After his short-term benefits expired, Darvell sought long-term benefits under the Plan.  The medical records in Darvell's administrative file reveal the following:

Darvell has a history of shoulder, arm, and hand pain stemming from injuries he suffered in a 1980 car accident.  AR 231, 316.  Darvell is primarily under the care of Dr. Douglas Johnson, a family practitioner; Dr. Raymond Hausch, a rheumatologist; and Dr. Thomas Kaiser, an orthopedic surgeon.  These doctors have diagnosed Darvell with three conditions: reflex sympathetic dystrophy ("RSD"),[1] osteoarthritis in both shoulders, and depression.  AR 231, 242, 246-47.  In the late 1990s, Dr. Kaiser performed surgery on both of Darvell's shoulders.  AR 271.  The surgeries enabled Darvell to go back to work; he had apparently been unemployed for some time before the surgeries.  AR 246.

Darvell's condition has long been managed through pain medication, regular administration of stellate-ganglion blocks,[2] and injections of anesthetic and cortisone into his shoulders.  Over the years, Darvell's symptoms have waxed and waned, and his doctors have

---

[1]RSD, also known as complex regional pain syndrome ("CRPS"), is a chronic and progressive neurological condition that is characterized by various degrees of burning pain, excessive sweating, swelling, and sensitivity to touch.  AR 196, 200-01.  Characteristic signs of the disorder that may appear in the affected area include shiny, thin skin; warmer or cooler skin; mottled skin; an increase or decrease in hair; and brittle, thickened nails.  AR 200.  Although the condition is most often triggered by an injury or other trauma to the affected area, the cause remains unknown.  AR 200.

[2]The stellate ganglion is an aggregation of nerve cells in the neck.  *Stedman's Medical Dictionary* 785, 787, 351 (28th ed. 2006) (definitions of "ganglion" and related terms).  A stellate-ganglion block is an injection of local anesthetic around this group of nerves.  *Id.* at 230 (definition of "nerve block").  Stellate-ganglion blocks have generally been successful in reducing Darvell's overall pain level for six to twelve months at a time, although more recently they have not been as effective.  *See* AR 317.

adjusted his medication regimen numerous times, both in an effort to improve his treatment and in response to problems with Darvell's prescription-drug coverage or the withdrawal of certain medications from the market.

In October 2004, Darvell's symptoms took a turn for the worse. He went to see both Dr. Hausch and Dr. Kaiser complaining of significantly increased pain. AR 242, 246. Darvell was emotionally upset and reported that the increased pain was preventing him from doing his job. AR 246. Darvell was having trouble with pushing, pulling, and lifting, and could no longer lift his right arm above shoulder level. AR 246. He also experienced crepitus (grinding and crackling) with the movement of his shoulders. AR 242; *Stedman's Medical Dictionary*, *supra* at 457 (defining "crepitus" and related terms). X-rays revealed progressive osteoarthritis in both shoulders, with his right shoulder significantly worse than his left, as well as osteophyte formation in his right shoulder joint. AR 247. Dr. Hausch administered cortisone/anesthetic injections in both shoulders. AR 242-43.

Both Dr. Kaiser and Dr. Hausch restricted Darvell to sedentary work, which could include lifting up to ten pounds and occasional walking and standing. AR 245, 247-48. Somewhat inconsistently, Dr. Hausch also stated that "I do not see any way [Darvell] can continue to do any work or sustain gainful employment given the amount of arthritis in his shoulder and also his reflex sympathetic dystrophy. . . . I do believe this patient is disabled and is unable to sustain gainful employment." AR 242. Dr. Kaiser also noted that Darvell had "a major problem right now with depression and anxiety." AR 247.

A few days later, Darvell saw Dr. Johnson, who opined that "depression was becoming a greater and greater part of his disability" and that Darvell "should be on disability due to depression." AR 249. Dr. Johnson prescribed an antidepressant. AR 249.

For the next four months (through February 2005), Darvell's doctors continued to restrict him to sedentary work, and  Darvell's symptoms continued to wax and wane.  At times, his range of motion was found to be markedly restricted, AR 260, 258, and he was in significant pain, AR 253, but these symptoms improved somewhat after treatment (in particular, after cortisone/anesthetic injections in his shoulders in January), AR 253-254.  In January, an MRI that was performed on Darvell's right shoulder revealed minimal thinning of the labrum[3] and some irregularity of the humeral head that was suggestive of mild degenerative change.  AR 252. Overall, Darvell's doctors did not seem to consider these findings particularly significant. AR 234 (noting that the "mininal degenerative change in the glenohumeral area is probably not the thing that is initiating all of his problems at this time"); AR 274 (noting "minimal evidence of disease on imaging studies").

On February 9, Dr. Johnson authored a letter opining that each one of Darvell's conditions (RSD, osteoarthritis, and depression) was in and of itself disabling — i.e., that each condition alone precluded Darvell from gainful employment of any kind.  AR 256-57. Dr. Johnson further opined that he did not think Darvell would be able to return to work as an account executive in the future.  AR 257.  Dr. Johnson also noted that antidepressants had improved Darvell's symptoms of depression and alleviated any need to see a psychiatrist.

---

[3]A labrum is a lip of cartilage around the concave portion of some joints, including the shoulder joint. *Stedman's Medical Dictionary*, *supra* at 1038.

AR 256-57.  About a week later, after a clinic visit, Dr. Johnson again noted that Darvell's symptoms of depression were improving.  AR 258.

On March 4, Dr. Johnson noted that Darvell's right shoulder was "jelling much more" and that he had a limited range of motion at his right shoulder and increased pain with any type of movement.  AR 259.  At this point, Dr. Johnson decided to order Darvell to stop working altogether.  AR 259.  Apparently in support of this decision, Dr. Johnson authored a second letter on March 30 — a letter that was essentially identical to the February 9 letter — again opining that each one of Darvell's three conditions was disabling, that Darvell was unable to work as a result of each condition, and that Dr. Johnson did not believe that Darvell would ever be able to return to work as an account executive.  AR 231-32.  Darvell's other doctors agreed that he was disabled and should not be working.  AR 236, 241, 321.

Darvell's last day of work was March 3, 2005.  AR 84.  As noted, Darvell applied for and received short-term disability benefits.  Over the next nine months (which is as far as the medical records in the administrative record go), Darvell's symptoms continued to wax and wane, and his doctors continued to make various adjustments to his pain medications.  There was some discussion of shoulder-replacement surgery, but Darvell's doctors ultimately decided against it. Darvell continued to receive regular stellate-ganglion blocks and shoulder injections.  At times, his range of motion was very restricted, and he was in pain much of the time, AR 233, 235, 236, 261, 318, 357, although the records do reflect some improvement with treatment, AR 216, 217, 220, 221, 222, 226, 227, 233, 235, 269, 358.   At one point (in May 2005), Dr. Kaiser noted that Darvell "really just cannot use the arms at all at this point," but this limitation was apparently

due solely to pain, as Dr. Kaiser also noted that Darvell had "excellent motion in both of his shoulders . . . ." AR 233.

Also in May, Darvell began seeing Dr. Edward Martinson, a physical-medicine and rehabilitation specialist. Dr. Martinson performed nerve-conduction studies, which indicated some abnormalities that suggested radiculopathy.[4] AR 352. Because the findings did not meet "strict diagnostic criteria," Dr. Martinson indicated that clinical correlation would be necessary. AR 352. In June, Dr. Kaiser noted that Darvell was showing signs of radiculopathy, and a neck x-ray showed "significant degenerative change" in one area of his C6-7 vertebrae. AR 216-17. Later, however, Dr. Hausch noted that the x-ray appeared normal, AR 239, and in July and October Dr. Martinson noted, respectively, that there were not "significant radicular type features to his pain" and that there was "[n]o clinical evidence at this time to suggest a cervical myelopathy/radiculopathy." AR 318, 269.

Also in July, Dr. Martinson noted that Darvell reported constant pain. AR 318. On a scale of zero to ten, Darvell described the pain as usually between six and eight, but he also said that he experienced level-ten pain three to four times per week for twelve to fifteen hours at a time, and that this increased pain usually followed a period of increased activity. AR 318. Generally, after receiving a stellate-ganglion block, his pain receded to level three to five, AR 318, although his more recent blocks gave him pain relief of shorter duration (only two to three months, rather than the more typical six to twelve months), AR 317.

---

[4]Radiculopathy is a disorder of the spinal nerve roots. *Stedman's Medical Dictionary*, *supra* at 1622.

Dr. Martinson agreed that Darvell should remain off work, AR 321, and instructed him in a series of therapeutic stretches, AR 320.  Finally, Dr. Martinson advised Darvell that it might be more effective to take his pain medications on a regular schedule rather than on an as-needed basis.  AR 320.  Darvell later reported that this was helpful.  AR 222.  Another stellate-ganglion block and shoulder injection later that month also resulted in significant improvement in his right shoulder and arm.  AR 226-27.

In October, Darvell was evaluated by Dr. Cassandra Schamber, a doctor in his clinic's pain program.  Dr. Schamber disagreed with the RSD diagnosis and instead diagnosed Darvell with central-cord syndrome.[5]  AR 274, 275.  Darvell saw Dr. Schamber for a followup visit, but after discussing the issue with Dr. Martinson, Darvell stopped participating in the pain program because of the risk that the inconsistent diagnoses could cause problems for him in his ongoing legal battle over worker's compensation.[6]  AR 287.

Also in October, Dr. Johnson filled out a "physical ability assessment" form indicating that, during an eight-hour work day, Darvell could "continuously" lift up to ten pounds; "frequently" lift, carry, push, or pull up to 20 pounds; "occasionally" lift and carry over 100 pounds; "frequently" sit, balance, stoop, kneel, crouch, and crawl; "frequently" work around machinery; "occasionally" stand, reach, perform fine manipulations and simple and firm grasping; "occasionally" withstand exposure to temperature extremes, wet conditions, and

_____

[5]Central-cord syndrome is a weakness in all four extremities that primarily affects the upper extremities and is usually caused by compression of the central part of the cervical spinal cord or artery.  *Stedman's Medical Dictionary*, *supra* at 1893.

[6]There are scattered references in the record to Darvell's legal battles over worker's compensation; apparently these stem from his 1980 car accident, which was work-related.

vibrations; and "occasionally" work overtime.  AR 283-84.  On the form, "continuously" is

defined as more than 5.5 hours each day, "frequently" as 2.5 to 5.5 hours, and "occasionally" as

less than 2.5 hours.  AR 283-84.

At times, Darvell suffered from bouts of depression, AR 318, 357, but generally

Dr. Johnson seemed satisfied that Darvell's symptoms were being treated adequately with

medication, AR 256-57, 231-32, 264.  Darvell did not see a mental-health professional of any

type until October 2005, when a psychologist saw Darvell as part of his evaluation for the pain

program.  AR 271, 275.  There are no records from this psychologist in the administrative

record, and although Darvell later told Dr. Schamber that he would like to continue seeing the

psychologist, AR 281, there is no indication that he did so.

### B.  LINA's Review of Darvell's Claim for Long-Term Benefits

After his short-term disability benefits expired in September 2005, Darvell sought long-

term disability benefits under the Plan.  In support of his claim, Darvell submitted a sampling of

his medical records from January through July 2005.  AR 171.  By letter dated October 19, 2005,

LINA denied Darvell's claim.  AR 170-74.  LINA's letter includes a two-page summary of

information gleaned from Darvell's medical records.  AR 171-73.  Based on its review of

Darvell's medical records, LINA found that Darvell had been experiencing similar symptoms for

many years and that there was no documentation of a significant physical limitation, such as loss

of range of motion or strength in either shoulder.  AR 172.  As a result, LINA concluded that the

medical data did not support Darvell's claim that he was unable to perform the material duties of

his regular occupation.  AR 173.  LINA relied on the Dictionary of Occupational Titles

("DOT")[7] to define the material duties of Darvell's job.  AR 172.

Darvell appealed and submitted more medical records, as well as the physical-ability

assessment that Dr. Johnson had completed in October 2005.  *See* AR 184-95.  LINA affirmed

the denial of benefits by letter dated April 11, 2006.[8]  AR 157.  In the letter, LINA advised

Darvell that he could request another review of his claim.  AR 158.  Darvell did not do so;

instead, he filed this action in April 2007.

*C.  The Disability Plan*

The Plan defines "disabled," in relevant part, as follows:

> An Employee is Disabled if, because of Injury or Sickness,
>
> 1.    he or she is unable to perform all the material duties of his
>       or her regular occupation, and solely due to Injury or
>       Sickness, he or she is unable to earn more than 80% of his
>       or her Indexed Covered Earnings from working in his or
>       her regular occupation . . . .

AR 122.  The Plan gives LINA the discretion to interpret the Plan's provisions and to administer

benefits.  Specifically, the Plan provides as follows:

> For plans subject to the Employee Retirement Income Security Act
> (ERISA), the Plan Administrator of the Employer's employee
> welfare benefit plan (the Plan) has appointed the Insurance
> Company as the Plan fiduciary under federal law for the review of
> claims for benefits provided by this Policy and for deciding
> appeals of denied claims.  In this role the Insurance Company shall
> have the authority, in its discretion, to interpret the terms of the

---

[7]The DOT was created by the Employment and Training Administration of the United
States Department of Labor.  *Jones v. Mountaire Corp. Long Term Disability Plan*, 542 F.3d
234, 235 n.2 (8th Cir. 2008).

[8]This letter is mistakenly dated 2005.  *See* AR 155.

> Plan documents, to decide questions of eligibility for coverage or
> benefits under the Plan, and to make any related findings of fact.
> All decisions made by the Insurance Company in this capacity
> shall be final and binding on Participants and Beneficiaries of The
> Plan to the full extent permitted by law.

AR 133.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  Failure to Exhaust

As noted, in its letter denying Darvell's appeal, LINA advised Darvell that he could seek a second review of the denial.  LINA argues that Darvell failed to exhaust his administrative remedies because he declined to avail himself of this second level of review.

Under ERISA, every plan must establish and maintain reasonable claims procedures, which must include at least one level of administrative review of an "adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(1).  Before seeking review in court, a claimant must exhaust this review procedure.  *See Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1063 (8th Cir. 2006) (claimants must exhaust contractual remedies when the ERISA plan includes contractual review procedures that comply with 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(f) and (g)).

ERISA regulations also permit — but do not require — plans to establish a second mandatory level of administrative review.  29 C.F.R. § 2560.503-1(c)(2), (d).  If the plan includes a second mandatory level of review, a claimant must pursue that second level in order to exhaust his remedies.  *See Price v. Xerox Corp.*, 445 F.3d 1054, 1057 (8th Cir. 2006) (affirming dismissal of claim where plaintiff failed to pursue a mandatory second level of review).

ERISA regulations also state, however, that a claimant will be deemed to have exhausted all administrative remedies available under a plan if the plan fails to establish or follow reasonable claims procedures.  29 C.F.R. § 2560.503-1(*l*).  To be considered "reasonable," claims procedures must include, among other things, the provision of a summary plan description ("SPD") that includes a description of all claims procedures — including all levels of administrative review — as well as the applicable time frames.  29 C.F.R. § 2560.503-1(b)(2), (d).

It is undisputed that the SPD for the Plan does not mention a second level of administrative review or any time periods that apply to such a level of review.  Carlson Aff.

Ex. A at 18-19, July 30, 2008.[9]  LINA argues that the SPD does not clearly *preclude* a second

level of review and that LINA is therefore authorized to require two levels.  Whether or not

LINA is authorized to require two levels of review is not the issue, however; the issue is whether

LINA complied with the requirement that the SPD include a description of the second level of

review.  It clearly did not.  Under § 2560.503-1(b)(2), (d), therefore, the Plan's claims

procedures are not "reasonable," and Darvell is deemed to have exhausted his administrative

remedies.[10]  29 C.F.R. § 2560.503-1(*l*).  The Court therefore denies LINA's motion to the extent

that it seeks dismissal on the basis of failure to exhaust.

B.  <i>Darvell's Claim for Benefits</i>

1.  Standard of Review

When an ERISA plan authorizes the claims administrator to determine eligibility for

benefits, courts review the administrator's eligibility determinations for abuse of discretion.

*Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2006).  Under that standard, an

administrator's decision will be upheld if it was reasonable, and an administrator's decision will

be deemed reasonable if the decision is supported by substantial evidence.  *Wakkinen v. UNUM*

*Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008).  Substantial evidence means "'more than

a scintilla but less than a preponderance.'"  *Id.* (quoting *Woo v. Deluxe Corp.*, 144 F.3d 1157,

---

[9]The July 30, 2008 affidavit of Scott Carlson describes the attached exhibit as the "Group Disability Insurance Certificate."  After this affidavit was filed, Darvell's attorney filed an affidavit stating that the document attached to the Carlson affidavit is not the same plan that appears in the administrative record.  Docket No. 29.  At oral argument, LINA clarified that the document attached to the Carlson affidavit is the SPD for the Plan.

[10]The Court notes that, after it raised this issue at oral argument, it gave LINA the opportunity to file a supplemental brief.  LINA submitted a letter brief, a copy of which is being filed contemporaneously with this order.

1162 (8th Cir. 1998)).  Even if the court would have made a different decision as an initial matter, the administrator's decision will be upheld if a reasonable person could have reached a similar decision.  *Id.*

When the administrator is also the insurer, however, the administrator has a conflict of interest that must be weighed in determining whether the administrator abused its discretion. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008).  The amount of weight given to the conflict depends on the circumstances of the particular case.  *Id.* at 2351.  For example, where an insurer has a history of biased claims administration, the presence of a conflict may be given substantial weight.  *Id.*  But where the record indicates that the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight.  *Id.*

In *Glenn*, the record contained little evidence about the insurer's efforts to ensure accurate claims assessment.  *Id.*  The Supreme Court found that, in light of the absence of such evidence, the court of appeals properly gave the conflict "weight to some degree" without making it determinative.  *Id.* at 2351-52.  Like the record in *Glenn*, the record in this case does not indicate, one way or the other, whether LINA has taken steps to protect the claims-assessment process from being influenced by the conflict.  Thus, as did the court of appeals in *Glenn*, this Court will give the conflict some, but not determinative, weight.

Darvell argues that, in addition to the conflict of interest, the presence of serious procedural irregularities requires the application of a less deferential standard of review.  Under pre-*Glenn* Eighth Circuit law, the presence of either a conflict of interest or a serious procedural irregularity could trigger a "sliding scale" standard of review, in which the amount of deference

given to the administrator's decision decreases in proportion to the seriousness of the conflict or procedural irregularity. *Woo*, 144 F.3d at 1161.

Obviously, after *Glenn*, *Woo* is no longer controlling with respect to the standard of review applicable when a conflict of interest is present. *Woo* held that the presence of a conflict could change the standard of review from abuse of discretion to a less deferential standard — even to de novo review. *Glenn* made clear that, no matter how severe the conflict, the standard of review remains abuse of discretion. *Glenn*, 128 S. Ct. at 2350. In reviewing for abuse of discretion, a court will give more or less weight to the conflict, depending on the severity of the conflict and the other considerations described in *Glenn*. But the ultimate question remains whether the administrator abused its discretion.

It is possible to read *Glenn* to hold that a procedural irregularity likewise cannot alter the standard of review, but instead is simply a factor to be weighed under the abuse-of-discretion standard. *See Glenn*, 128 S. Ct. at 2347, 2351-52 (approving of the court of appeals' review, which applied a deferential standard and took into account both the financial conflict and various procedural irregularities). But the Eighth Circuit has rejected this reading of *Glenn*, holding that, when a serious procedural irregularity is found to exist, *Woo* continues to apply. *Wakkinen*, 531 F.3d at 582 ("We continue to examine this claim [of procedural irregularity] under *Woo*"). The Court will therefore examine whether there is a serious procedural irregularity that would dictate a more stringent standard of review under *Woo*.

Darvell alleges that there were a number of procedural irregularities similar to those present in *Woo*. Specifically, Darvell argues that LINA failed to obtain an independent medical

-14-

review, failed to thoroughly investigate and examine his claim, and failed to use proper judgment.

Darvell points to nothing in the Plan that required LINA to obtain an independent medical review, and the law does not require such a review in every case. *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 678 (8th Cir. 2005). In *Woo*, the plaintiff did not receive a proper diagnosis until after she had already left her job; her doctors were thus able to determine that she was disabled only in retrospect. Under those circumstances, an independent medical review by a specialist was necessary because the claimant's contemporaneous medical records did not clearly indicate the nature of her condition, and it was not possible to tell, based only on those records, whether she had been disabled during her employment. In this case, though, the nature of Darvell's conditions are thoroughly documented in his medical records, and LINA does not dispute Darvell's diagnoses. Under these circumstances, LINA was not required to conduct an independent medical review in order to make its decision.

Nor does the record support Darvell's contention that LINA failed to investigate or examine his claim or failed to use proper judgment. LINA's initial denial letter demonstrates that LINA reviewed the medical evidence that Darvell submitted. It is true, as Darvell argues, that LINA's explanation for the denial can be read to discount certain evidence regarding Darvell's functional limitations. But the mere fact that an administrator, in denying a claim, discounts some of the evidence submitted by the claimant is not itself a procedural irregularity. If it were, a procedural irregularity would be present in virtually every case in which a claim is denied, and abuse-of-discretion review would be the exception rather than the norm. The record in an ERISA denial-of-benefits case typically contains conflicting or inconsistent evidence, and

thus the administrator has no choice but to discount *something*.  Whether the discounting of evidence by the administrator qualifies as a procedural irregularity depends on how and why the evidence is discounted.  If the administrator adequately explains its decision, and its decision is based on the strengths and weaknesses of the evidence (rather than simply on the desire to deny the claim), then there is nothing "irregular" about discounting some of the evidence.

Even if LINA's discounting of some of Darvell's evidence qualified as a serious procedural irregularity, the presence of such an irregularity is not sufficient to trigger a less deferential standard of review.  Darvell must also show that the irregularity had some connection to the substantive decision to deny benefits; in fact, Darvell must introduce evidence that, but for the irregularity, LINA would have approved his claim.  *Torres*, 405 F.3d at 679.[11]  This presents a "considerable hurdle" for a claimant — a hurdle that claimants leap only rarely.  *Id.* at 680.  In this case, as discussed below, there is evidence in the record from Darvell's own primary-care physician concerning Darvell's functional capacities that Darvell does not dispute and that fully supports LINA's decision to deny benefits.  Hence the fact that LINA may have de-emphasized some aspects of Darvell's medical records cannot be said to have a connection to its decision to deny benefits.  The Court will therefore apply the abuse-of-discretion standard, taking LINA's financial conflict of interest into consideration.

---

[11]In *Torres*, the Eighth Circuit held that the claimant had failed to show that a "financial conflict of interest had a sufficient connection to the decision reached" because the claimant "presented no evidence that [the insurer] denied his claim because it was financially advantageous for it to do so."  *Torres*, 405 F.3d at 679.

2.  Whether Darvell is Disabled

The Plan provides benefits when a claimant is "unable to perform all the material duties of his . . . regular occupation . . . ."  AR 122.  Whether Darvell is disabled depends on both the extent of his functional limitations and the meaning of the phrase "material duties of his . . . regular occupation."

a.  Darvell's Physical Limitations

Darvell argues that the medical evidence in the administrative record demonstrates that he had ongoing and persistent functional deficits, and emphasizes that all three of his main doctors — Dr. Johnson, Dr. Kaiser, and Dr. Hausch — found him to be disabled from work. The Court agrees that there is ample evidence to support Darvell's contention that he suffered significant pain and functional limitations in his shoulders, arms, and hands.  But there is also evidence that Darvell's symptoms improved with treatment, and it is difficult to tell, from Darvell's medical records alone, to what extent his conditions limited his ability *to perform his job*.  The only evidence in the record that attempts to quantify Darvell's capabilities *in a work setting* is the October 2005 physical-ability assessment completed by Dr. Johnson, Darvell's primary-care doctor.[12]

Darvell does not argue that the physical-ability assessment is an inaccurate representation of his abilities, that it is outweighed by other evidence in the record, or that LINA should not

_____

[12]According to LINA's letter denying Darvell's appeal, the benefit waiting period — that is, the time period during which Darvell must have been disabled in order to be eligible for benefits — was from March 4, 2005 through August 30, 2005.  AR 158.  But as part of the administrative process, Darvell submitted medical and other evidence pertaining to his condition and abilities after August 30, 2005, including the October 2005 physical-ability assessment. Neither party has argued that this evidence is not relevant to determining Darvell's abilities during the benefit waiting period.

have relied on it in determining the extent of his functional capacity.  In short, Darvell does not dispute that he could do everything that the physical-ability assessment said he could do during the relevant time period.  For that reason, if Darvell's capabilities, as documented in the physical-ability assessment, enabled him to perform all of the "material duties" of his "regular occupation," then LINA's decision should be upheld.[13]  The fact that LINA was operating under a conflict of interest would not provide sufficient reason to overturn LINA's decision.

The only real question, then, is what are the "material duties" of Darvell's "regular occupation"?  LINA concluded that Darvell was fully capable of performing the duties of an "advertising sales representative" as defined in the Dictionary of Occupational Titles ("DOT").[14] Darvell contends that LINA erred by using the DOT.  Instead, according to Darvell, LINA should have considered the duties that he actually performed for Yellow Book — duties that included extensive driving and overtime — to determine whether he was disabled.

---

[13]As discussed below, the evidence that Darvell's depression was disabling — either by itself or in combination with Darvell's physical limitations — is virtually nonexistent.

[14]The DOT defines the occupation of advertising sales representative as "light work." 1 Employment & Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles* 222 (4th ed. rev. 1991).  The administrative record contains a description of the physical requirements of that occupation that is apparently based on the DOT's definition of "light work" but is more detailed.  *Compare* AR 454 *with* 2 Employment & Training Admin., U.S. Dep't of Labor, *supra* at 1013.  For ease of reference, the Court generally follows the parties' practice in referring to the description in the record as that of the DOT; Darvell does not contend that there is any inconsistency between the two, and the Court can find none.

The Court also notes that Darvell does not fault LINA for relying on the DOT rather than on the O*Net, a database of occupational requirements that has replaced the DOT.  *See Jones*, 542 F.3d at 235 n.2.  Nor does Darvell contend that his occupation should be classified under the DOT as something other than "advertising sales representative."

b.  "Regular Occupation"

As noted, the Plan gives LINA the discretion to interpret the terms of Plan documents. When an ERISA plan gives the administrator such discretion, courts review the administrator's interpretation of the plan only for abuse of discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Under this standard, the Court must defer to LINA's interpretation of the Plan as long as it is "reasonable," even if the Court would interpret the language differently as an original matter.  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc).  To determine whether an administrator's interpretation is "reasonable," courts apply the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992).  The *Finley* factors are:  (1) whether the administrator's interpretation is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.  *Id.* at 621.  The Eighth Circuit has directed district courts to examine all five *Finley* factors.  *Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 584 (8th Cir. 1995).

i.  Contrary to Clear Plan Language

Darvell is not entitled to long-term disability benefits under the Plan unless "he . . . is unable to perform all the material duties of his . . . regular occupation."  AR 122.  The phrase "material duties of his . . . regular occupation" can be interpreted in one of two ways:  claimant-specific or generic.  The claimant-specific approach examines what duties the specific claimant

actually performed for his specific employer, while the generic approach examines the duties

that are commonly performed by those who hold the same occupation.  To illustrate:  Suppose

that the claimant was an attorney who represented migrant agricultural workers, spent very little

time in his office, spent a great deal of time driving from site to site, and often had to trudge

through farm fields to meet with clients under the broiling sun.  Under the claimant-specific

approach, the claimant would be found disabled if he was no longer able to drive many hours

every day or walk through difficult terrain in hot weather.  Under the generic approach, however,

the same claimant would not be found disabled, assuming that attorneys generally do not have to

do much driving or much walking through difficult terrain in hot weather.

The Plan does not define "regular occupation" or give any guidance on whether, in

determining if a claimant "is unable to perform all the material duties of his . . . regular

occupation," the claims administrator should take a claimant-specific or generic approach.  And

courts have split on the question whether "regular occupation" and similar phrases focus on the

claimant's actual duties or instead focus more broadly on the duties generally associated with the

occupation.  *Compare House v. Am. United Life Ins. Co.*, 499 F.3d 443, 453-54 (5th Cir. 2007)

(attorney's "regular occupation" was the general occupation of "attorney," rather than the

attorney's previous job as a litigator with a uniquely stressful practice), *cert. denied*, 128 S.Ct.

1309 (2008), *Schmidlkofer v. Directory Distrib. Assocs., Inc.*, 107 Fed. Appx. 631, 633-34 (6th

Cir. 2004) (insurer's interpretation of "regular occupation" to mean the insured's occupation as it

is performed in a typical work setting in the general economy was reasonable), *and Gallagher v.

Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270-73 (4th Cir. 2002) (insurer's reliance on

DOT description was permissible, even though it did not include a travel requirement) *with*

*Bishop v. Long Term Disability Income Plan of SAP Am., Inc.*, 232 Fed. Appx. 792, 794-95 (10th Cir. 2007) (insurer was required to consider claimant's actual job duties in determining the "essential duties" of his occupation), *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385-86 (3d Cir. 2003) (unambiguous meaning of "regular occupation" is the usual work that the employee is actually performing immediately before the onset of disability), *and Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252-53 (2d Cir. 1999) (although the term "regular occupation" is not limited to the claimant's particular job, it should include consideration of the nature of the institution where the claimant was employed).  The Eighth Circuit does not appear to have addressed this issue directly (although it recently suggested, in dicta, that a district court could consider remanding a case in which there was a dispute over the proper job description). *See Jones*, 542 F.3d at 239.

If the Court were to interpret the Plan as an original manner — without deferring to LINA — the Court might agree with Darvell that, in referring to Darvell's ability "to perform all the material duties of his . . . regular occupation," the Plan is referring to the duties that Darvell actually performed, and not to the duties that are typically performed by advertising sales representatives.  But the Court recognizes that it is common for the term "occupation" to be used to denote a class of jobs rather than a particular job for a particular employer.  The phrase "material duties of his . . . regular occupation" is therefore ambiguous, and LINA's interpretation — that it refers generally to the material duties performed by advertising sales representatives, and not specifically to the material duties performed by Darvell for Yellow Book — is certainly reasonable.  The fact that there are judicial decisions on both sides of this question only bolsters the Court's conclusion that, although it is not necessarily the interpretation that the Court would

adopt, LINA's interpretation is not contrary to the clear language of the Plan.  *Cf. King*, 414 F.3d
at 999 (an administrator with discretion to interpret uncertain terms is not bound by judicial
interpretations of that term so long as the administrator's interpretation is reasonable).

### ii.  Conflicts with ERISA

Darvell has not identified, and the Court is not aware of, any ERISA provision that
conflicts with LINA's interpretation of the Plan.

### iii.  Other Plan Language

Darvell does not contend that LINA's interpretation renders any other Plan language
meaningless or internally inconsistent.

### iv.  Goals of the Plan

Darvell's interpretation of the Plan would likely result in greater coverage, and therefore
one could argue that LINA's narrower interpretation is inconsistent with the goal of the Plan to
provide coverage for disabled employees.  But it cannot be the case that any interpretation that
narrows coverage is inconsistent with a plan's goals, for the goal of any plan is to provide
coverage consistent with its terms.

Although LINA's interpretation is narrower than Darvell's, it does not unreasonably limit
the scope of coverage.  Under the LINA interpretation, Darvell would not be considered disabled
if he could perform the material duties commonly performed by advertising sales representatives
— the field in which he most recently worked and has considerable experience.  To deny long-
term disability benefits to Darvell on the grounds that he can perform all of the duties performed
by most advertising sales representatives — even if he cannot perform the duties of his specific
position with Yellow Book — does not seem unreasonable and certainly does not render the

long-term disability policy useless.  Moreover, LINA did not arbitrarily invent a set of duties

wholly unconnected to Darvell's occupation.  LINA based its determination on an objective

description of Darvell's occupation that was created by the United States Department of Labor.

Under these circumstances, LINA's interpretation is not inconsistent with the goals of the Plan.

v.  Consistency

The final consideration is whether LINA has consistently followed the interpretation.

There is no dispute that LINA has consistently used the DOT description of "advertising sales

representative" to determine the material duties of Darvell's occupation.

The *Finley* factors all indicate that LINA's interpretation of the "material duties of

[Darvell's] . . . regular occupation" is reasonable.  Accordingly, LINA's denial of benefits must

be upheld if the duties generally performed by an advertising sales representative, as described in

the DOT, are within Darvell's functional capabilities.

c.  Comparing Darvell's Limitations to the DOT

According to the DOT, the occupation of advertising sales representative requires the

ability to lift, carry, push, or pull up to 20 pounds occasionally, up to ten pounds frequently, or a

negligible amount constantly.  The occupation also requires occasional reaching, handling, and

fingering.  Finally, the occupation can require frequent walking or standing or pushing or pulling

of arm or leg controls.  Like the physical-ability assessment, the DOT defines "occasionally" to

mean up to one-third of the time and "frequently" to mean between one- and two-thirds of the

time.  2 Employment & Training Admin., U.S. Dep't of Labor, *supra* at 1013.

It is apparent that most of these duties are well within Darvell's limitations as stated in

the physical-ability assessment completed by Dr. Johnson.  As noted earlier, the physical-ability

assessment indicates that Darvell could "continuously" lift up to ten pounds; "frequently" lift, carry, push or pull up to 20 pounds, and "occasionally" lift and carry over 100 pounds; "frequently" sit, balance, stoop, kneel, crouch, and crawl; "frequently" work around machinery; "occasionally" stand, reach, and perform fine manipulations and simple and firm grasping; and "occasionally" withstand exposure to temperature extremes, wet conditions, and vibrations.[15] AR 283-84.

Darvell points out that the DOT states that "frequent" standing may be required, whereas Dr. Johnson found him capable of standing only "occasionally" (that is, less than 2.5 hours per day). But the DOT description only states that the occupation *can* include frequent standing; the definition of "light work" in the DOT makes clear that an occupation can be "light work" *either* because it involves exerting a specified amount of force *or* because it involves walking or standing "to a significant degree." 2 Employment & Training Admin., U.S. Dep't of Labor, *supra* at 1013. Darvell does not point to any evidence in the record establishing that standing more than 2.5 hours per day is a material duty of his regular occupation, and it was not an abuse of discretion for LINA to ignore that duty in considering his claim.

LINA did not abuse its discretion in using the DOT description of Darvell's job duties, and there is uncontroverted evidence in the record from Darvell's own primary-care doctor that

---

[15]The physical-ability assessment does not indicate the extent of Darvell's walking capability; Dr. Johnson left that section blank. The assessment does state, though, that Darvell can "frequently" carry up to twenty pounds. The DOT defines "carrying" as "[t]ransporting an object, usually holding it in the hands or arms, or on the shoulder." 2 Employment & Training Admin., U.S. Dep't of Labor, *supra* at 1012. Similarly, the most relevant dictionary definition of "carry" is "[t]o hold or support while moving; bear . . . ." *American Heritage Dictionary of the English Language* 285 (4th ed. 2000). Under either definition, the ability to carry frequently presupposes the ability to walk frequently.

Darvell was capable of performing all of those duties.  Under these circumstances, LINA's denial of Darvell's claim was not an abuse of discretion.

### d.  Darvell's Depression

As noted earlier, Dr. Johnson found Darvell disabled not only because of his physical condition, but also because of his depression.  But the evidence supporting Dr. Johnson's finding of disabling depression is remarkably thin.  Dr. Johnson diagnosed Darvell with depression — depression so severe and resistant to treatment that it alone rendered Darvell disabled — after a single twenty-minute discussion with Darvell.  AR 249.  Dr. Johnson is a family practitioner; he is neither a psychiatrist nor a psychologist, and the record does not show that he has any special training or experience in diagnosing or treating depression.  Dr. Johnson found Darvell disabled by depression without the benefit of any psychiatric evaluation or testing, and despite the fact that antidepressants were effective in treating Darvell's depression.  Indeed, Dr. Johnson stated that the antidepressants precluded the need for referral to a psychiatrist.  AR 256-57.  Other than one evaluation by a psychologist in the pain program (the results of which do not appear in the record), there is no indication that Darvell ever saw a mental-health specialist of any kind. Given the near-complete lack of evidence supporting Dr. Johnson's conclusion that Darvell is disabled by depression, LINA's finding that Darvell's depression was not disabling — even in combination with his physical condition — was not an abuse of discretion.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.      Defendant's motion for summary judgment [Docket No. 18] is GRANTED.

2.      Plaintiff's complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND

ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December  3 , 2008                              s/Patrick J. Schiltz
                                                       Patrick J. Schiltz
                                                       United States District Judge